IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 265 |
| v. | |
| ADAM WALTON | Judge Sara L. Ellis |

## MOTION TO SUPPRESS

ADAM WALTON, by the Federal Defender Program and its attorney Amanda Penabad, respectfully submits this motion to suppress the handgun that was recovered as a result a warrantless search of a vehicle. Mr. Walton further requests that the Court suppress, as fruits of the poisonous tree, the statements that were made by Mr. Walton as a result of the violations of his Fourth Amendment rights. In support of this motion, Mr. Walton states the following:

## BACKGROUND

According to police reports, in the early hours of June 1, 2020, four Chicago Police Department officers drove to the parking lot of Marshfield Plaza in Chicago. *See* Exhibit A, Arrest Report.[1] The officers observed that the glass windows Old Navy clothing store in Marshfield Plaza has been smashed and that individuals had looted the store. *Id.* at 3. The officers observed an individual, later identified as Mr. Walton, exit the store and approach a black Honda CR-V parked in the parking lot. Mr. Walton did not enter the vehicle, but instead fled from officers. A short time later, Mr. Walton returned to the vehicle and was approached by officers. According

---

[1] For the purpose of this motion, Mr. Walton relies on police reports to provide background information.

to the officers, when questioned whether there was any contraband in the car, Mr. Walton freely admitted that he had a gun in the car. *Id*.[2] Officers McDonald then "observed a semi-automatic handgun in the center cup holder that was uncased and immediately accessible and loaded with an unknown number of live rounds." *Id*. The officers searched the vehicle and recovered a firearm in the center cup holder of the front seat compartment. According to the officers, Mr. Walton was then searched and freely admitted that he was on parole for a gun offense. The officers then placed Mr. Walton into custody.

Subsequent to Mr. Walton's arrest, the arresting officers were interviewed by the investigating agent and Assistant United States Attorney. Officer McDonald clarified and amended the narrative he attested to in the arrest report in this subsequent interview. In that June 9th, 2020 interview, memorialized in the Officer Interview Disclosure Letter, Officer McDonald stated that "[i]nitially, he did not observe a firearm on the floor [of the vehicle]. Officer McDonald then observed a large pile of stolen merchandise on the center console, between the driver and passenger seats. When he moved the merchandise out of the way, he saw the Walther P22 in a cup holder in the center console." Exhibit B, Officer McDonald Interview Disclosure Letter.

---

[2]  No body camera footage exists to confirm that such a statement was made, despite the CPD's Body Worn Camera Policy, memorialized in Special Order S03-14, which mandates that officers activate the body worn camera system for investigatory stops, among other circumstances. Two officers have stated that their body-worn cameras ran out of battery, and two have stated that they did not wear body cameras that evening.

## ARGUMENT

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate." *United States v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008) (citing *Groh v. Ramirez*, 540 U.S. 551, 575, 124 S. Ct. 1284, 157 L.Ed. 2d 1068 (2004)). Accordingly, "[a] warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L.Ed. 2d 485 (2009)). Indeed, if law enforcement officials conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *Id*. (citing *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)).

In *United States v. Leiva*, the Seventh Circuit stated that a police officer may search an automobile without a warrant if he has reasonable suspicion that an occupant possesses or the car itself possesses accessible weapons, if he has probable cause to believe the car contains evidence of criminal activity, or if the occupant of the car consents to a search. 821 F.3d 808 (7th Cir. 2016). Mr. Walton asserts that none of these exceptions applies in this case.

A.  *The Officers Did Not Have Reasonable Suspicion to Believe the Car had Accessible Weapons.*

The first exception listed in *Leiva* is derived from the Supreme Court's automobile jurisprudence as articulated in *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). In *Long*, the Court held that a search of vehicle "is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049 (internal quotations omitted).

The officers' narrative does not establish that Mr. Walton was armed or within reaching distance of the passenger compartment of the car at the time of the search. According to Officer McDonald, when Mr. Walton returned to the area of the parked CR-V, the four officers had exited their vehicle and were peering through the windows of the vehicle. Exhibit B at ¶¶5-6. The officers ordered Mr. Walton to "stand back," *id.* at ¶6, and Mr. Walton "kept a distance between himself and the officers." *See* Exhibit C, Officer Richardson Interview Disclosure Letter, at ¶5. Mr. Walton was outnumbered by the four officers and not within reaching distance of the car at the time of the search. The search of the CR-V therefore does not fall within the exception for when an individual may "gain immediate control of weapons." *Long*, 463 U.S. at 1049.

4

B. *The Officers Did Not Have Probable Cause to Believe Mr. Walton Possessed a Gun Illegally*.

As noted above, the arrest report indicates that the officers approached Mr. Walton and conducted a field interview, inquiring about contraband in the car. According to the arrest report, Mr. Walton told officers "I have a weapon in the car." The arrest report further states that Officer McDonald "immediately observed a semi-automatic handgun in the center console uncased and immediately accessible." Exhibit A at 3. In his subsequent interview, Officer McDonald clarified that he did not initially see a weapon, and only saw the firearm after entering the vehicle and moving items within. Exhibit B at ¶7.

First, Officer McDonald's revised statement to the investigating agent and AUSA makes clear that he did not see a firearm in plain view when looking into the windows of the parked vehicle. Exhibit B, at ¶7. None of the officers stated that a firearm was visible prior to the search of the vehicle.

Second, Mr. Walton denies making a statement to Officer McDonald that he had a firearm in the vehicle. Without that statement, the officers had no probable cause to believe a weapon was in the vehicle.

Third, even if the Court were to find that Mr. Walton did make the statement Officer McDonald alleges, the officers still did not have probable cause for a search of the vehicle. The change in Officer McDonald's testimony is material. The Seventh Circuit has held that the "'mere possibility of unlawful use' of a gun is not sufficient to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892 (2018) (citing *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014–15 (7th Cir. 2016)). A

5

"report of guns in public does not necessarily suggest criminal activity and can be perfectly legal in certain cases." *United States v. Swinney*, 463 F. Supp. 3d 851, 857 (N.D. Ill. 2020) (citing *Watson*, 900 F.3d at 896). Instead, it must be "sufficiently probable that the observed conduct suggests unlawful activity." *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016).

Possessing a firearm in a vehicle is not illegal in Illinois. Those who possess a Firearm Owners Identification card (FOID) may transport a firearm in a vehicle as long as it is unloaded and in a case. 720 ILCS 5/24-1(a)(4). Those who have a concealed carry license (CCL) may "keep or carry a loaded or unloaded concealed firearm on or about his or her person within a vehicle." 430 ILCS 66/10(c)(2). Officer McDonald's revised testimony to the agent and AUSA indicates that he did not see an uncased and immediately accessible firearm prior to searching the vehicle. Instead, the officer relied solely on Mr. Walton's alleged statement that a firearm was in the car prior to searching. The officer's statement does not indicate that he determined that the weapon was immediately accessible or uncased prior to searching the car.

Nor does the officer's statement indicate that he determined that Mr. Walton was a felon or lacked a FOID or CCL prior to initiating his search. Indeed, according to Officer Richardson, the officers did not determine that Mr. Walton did not have a FOID card until after the search. Exhibit C, at ¶6. The arrest report narrative also places the vehicle search prior to the officers' inquiry into Mr.

Walton's background. Exhibit A at 3. At the time the search was performed, the officers knew only that a firearm was in the vehicle, which is not illegal.

C. *The Officers Did Not Have Probable Cause to Believe the Car Contained Evidence of Other Criminal Activity.*

Nor did the police have probable cause to search based on a belief that the vehicle contained evidence of other criminal activity. According to two of the officers, after Mr. Walton left the Old Navy allegedly carrying merchandise, he did not enter the parked car. Instead, the officers allege that Mr. Walton dropped all of the merchandise in the parking lot. *See, e.g.*, Exhibit B at ¶4. ("WALTON attempted to open the driver's side door of the CR-V, but was unsuccessful. He then dropped the items he was carrying and ran southbound through the plaza parking lot."); Exhibit C at ¶3. The officers therefore had no basis to believe that any stolen merchandise was in the car because they allegedly witnessed Mr. Walton drop it all.

The arrest report does not allege that there was stolen merchandise in the vehicle to support a search. In the officers' subsequent interviews with the agent and AUSA, the officers alleged that they saw stolen merchandise in plain view in the vehicle. *See* Exhibit C at ¶4. This allegation is disputed by a witness on the scene, who both drove to the parking lot with Mr. Walton, returned to the car with Mr. Walton and encountered the officers, and drove the car home from the scene. *See* Exhibit D, Affidavit of Pedro Alfaro (describing interview with Danielle Davenport). Ms. Davenport affirmed that no stolen merchandise was in the car when the individuals arrived in the parking lot, that she did not see any stolen merchandise in the car when police were questioning Mr. Walton, and that the

police did not remove any stolen merchandise from the car before allowing her to drive off in the vehicle. *See id*.

Because there was no basis to believe that stolen merchandise was in the car, the officers did not have reasonable suspicion to search the vehicle for evidence of criminal activity.

D. *The Officers Did Not Have Consent to Search the Car.*

None of the officers allege that Mr. Walton consented to the search of the car. The arrest report contains no such allegation. *See* Exhibit A. The memoranda of interviews with the individual officers indicate that officers ordered Mr. Walton to unlock the car and subsequently searched the vehicle. *See, e.g.*, Exhibit B at ¶7. None of the officers allege that they asked for consent to search the vehicle.

## CONCLUSION

For these reasons, Mr. Walton contends that no exception to the warrant requirement applies to the search of the vehicle, and the evidence found as a result of the illegal search must be suppressed.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By:    s/ *Amanda G. Penabad*
Amanda G. Penabad

AMANDA G. PENABAD
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8340

8

# EXHIBIT A

# CHICAGO POLICE DEPARTMENT
# ARREST REPORT

**FINAL APPROVAL**

3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11. 420C(REV. 6/30)

CB #: 19965806
IR #: 1192949
YD #:
RD #: JD249192
EVENT #: 2015300162

## ARREST REPORTING

**OFFENDER**

**Name:** WALTON, Adam T
**Res:** ███████ Chicago, IL 60621
Unknown
**Beat:** 731

**DOB:** ███████
**AGE:** ███████
**POB:** Illinois
**DLN:** ███████
**DL :** ███████
**ARMED WITH** Handgun

**Marks:** Tattoo Amber on Upper Right Arm

**INCIDENT**

**Arrest Date:** 01 June  2020 00:10   **TRR Completed?** No
**Location:** 11700 S Marshfield Ave    **Beat:** 2234
Chicago, IL  60643
277 -  Parking Lot / Garage (Non Residential)
**Holding Facility:** District 022 Lockup
**Resisted Arrest?** No

**Total No Arrested:** 1   **Co-Arrests**   **Assoc Cases**
**DCFS Ward ?** No
**Dependent Children?** No

**CHARGES**

| | | | |
|---|---|---|---|
| 1 | Offense As Cited | **720 ILCS 5.0/24-1.7-A** **ARMED HABITUAL CRIMINAL** Class  X - Type  F | **Victim** P.O. Mcdonald #19423 |
| 2 | Offense As Cited | **725 ILCS 5.0/110-3** **ISSUANCE OF WARRANT** Class  Z - | |

**FELONY REVIEW**

**Felony Review :**  Approved    01 JUN 2020 02:40     Silas-Wail, M     State's Attorneys's Office

IR #1192949

**RECOVERED NARCOTICS**

**NO NARCOTICS RECOVERED**

CB #:19965806

powered by: CLEAR Technology

20 CR 265_000035

Chicago Police Department - ARREST Report

CB #: 19965806

WALTON, Adam

## ARREST REPORTING

**WARRANT**

| Warrant No | Issue Date | Type | NCIC/ Leads No | Hold | Bond Amount | Case Docket No | County |
|---|---|---|---|---|---|---|---|
| MI2003709 | 01-JUN-20 | Parole / Mandatory Violation | | | | | Cook |

Remarks: IDOC PAROLE BOARD OPERATOR REDDY CONTACTED AT 0137 HOURS AND
ADVISED A WARRANT WILL BE ISSUED AND PROVIDED TRACER #134641844.

**NON-OFFENDERS**

### VICTIM AND COMPLAINANT

Name: P.O. MCDONALD #19423
Empl: 1900 W Monterey Ave
Chicago, IL 60643

RES: 3127450570

Beat: 2212

DOB:
Age: years

Comments:

Injured? No    Deceased? No

Hospitalized? No

Treated and Released? No

**ARRESTEE VEHICLE**

Vehicle:        VEHICLE IMPOUNDED:
2007   Automobile - Honda - Cr-V - Hatchback (4-Door)    VIN#: JHLRE487X7C050336    Lic#: X228235    IL
Color: Black (Top) / Black (Bottom)                                                    Inv#:
Pound#:
Disposition:

**PROPERTIES**

Confiscated Properties :
All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR    WALTON, Adam,    NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

powered by: CLEAR Technology

20 CR 265_000036

**Chicago Police Department - ARREST Report**

CB #: 19965806

WALTON, Adam

## ARREST REPORTING

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)

EVENT #00162. ***EVENT NOT RECORDED BY BWC*** THIS IS AN ON-VIEW ARREST BY BEAT #2263C WORKING IN FULL UNIFORM AND DRIVING AN UNMARKED CHICAGO POLICE DEPARTMENT VEHICLE. IN SUMMARY, A/O'S OBSERVED OFFENDER EXIT THE OLD NAVY CLOTHING STORE LOCATED AT 11700 SOUTH MARSHFIELD AVENUE (MARSHFIELD PLAZA) THROUGH A BROKEN WINDOW, WHICH WAS PREVIOUSLY LOOTED. OFFENDER ATTEMPTED TO ENTER THE DRIVER'S SIDE DOOR OF A BLACK HONDA CRV BEFORE FLEEING ON FOOT. OFFENDER RETURNED TO SAID VEHICLE A SHORT TIME LATER. OFFENDER RELATED TO A/O'S THAT HE RETURNED TO OBTAIN HIS VEHICLE. A/O'S CONDUCTED A FIELD INTERVIEW WITH OFFENDER AND INQUIRED ABOUT CONTRABAND IN THE VEHICLE. OFFENDER STATED TO A/O'S, "I HAVE A WEAPON IN THE CAR." OFFENDER RELATED THE WEAPON WAS LOCATED NEAR THE DRIVER SIDE FLOOR OF THE VEHICLE. A/O MCDONALD #19423 OBSERVED A SEMI-AUTOMATIC HANDGUN IN THE CENTER CUP HOLDER THAT WAS UNCASED AND IMMEDIATELY ACCESSIBLE AND LOADED WITH AN UNKNOWN NUMBER OF LIVE ROUNDS. A/O MCDONALD RECOVERED A WALTHER P22, DEFACED SERIAL NUMBER, .22 LONG RIFLE CALIBER, SEMI-AUTOMATIC HANDGUN, 2.5IN BARREL, BLUE STEEL, MADE IN GERMANY, WHICH WAS INVENTORY #14713034. A/O MCDONALD ALSO RECOVERED ONE CASE OF .22 LONG RIFLE CALIBER LIVE ROUNDS WHICH WAS INVENTORY #14713037. OFFENDER FREELY STATED, "I KNOW I SHOULDN'T HAVE A GUN, AND "I'M ON PAROLE FOR A GUN." A/O'S CONDUCTED A NAME INQUIRY AND LEARNED OFFENDER IS CURRENTLY ON PAROLE. OFFENDER WAS PLACED INTO CUSTODY AND TRANSPORTED TO THE 022ND DISTRICT FOR PROCESSING. OFFENDER WAS MIRANDIZED AT 1242 HOURS BY A/O PARUSZKIEWICZ #17844 WITH A/O MCDONALD BEING WITNESS. OFFENDER REFUSED TO ANSWER QUESTIONS. IDOC PAROLE BOARD OPERATOR REDDY WAS CONTACTED AT 0137 HOURS AND ISSUED A WARRANT FOR OFFENDER AND PROVIDEED TRACER #134641844. OFFENDER IS A DOCUMENTED GANGSTER DISCIPLE WITH UNKNOWN FACTION PER CLEAR. FELONY CHARGES APPROVED AT 0240 HOURS BY ASA M. SILAS-WAIL. ISR COMPLETED.

| COURT INFO | | BOND INFO | |
|---|---|---|---|
| Desired Court Date: | 08 June 2020 | Bond Date: | 01 June 2020 6:30 |
| Branch: | 38-5   727 E 111TH ST - Room | Type: | No Bond Posted |
| Court Sgt Handle? | No | Receipt #: | |
| Initial Court Date: | 01 June 2020 | Amount: | |
| Branch: | CBC-1  2600 S CALIFORNIA - Room100 | | |
| Docket #: | | | |

## REPORTING PERSONNEL

### ATTESTING OFFICER:

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

| Attesting Officer: | #19423 | MCDONALD, B D (PC0AR01) | 01 JUN 2020 03:20 | |
|---|---|---|---|---|

### ARRESTING OFFICER(S):

| | | | | Beat |
|---|---|---|---|---|
| 1st Arresting Officer: | #19423 | MCDONALD, B D (PC0AR01) | | 2263C |
| 2nd Arresting Officer: | #17844 | PARUSZKIEWICZ, K J (PC0W571) | | 2263C |

### APPROVING SUPERVISOR:

| Approval of Probable Cause : | #397 | REYNOLDS, K R (PC0P787) | 01 JUN 2020 03:32 | |
|---|---|---|---|---|

20 CR 265_000037

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| Paul Mower | Dirksen Federal Courthouse | Direct Line: (312) 353-5349 |
| Assistant United States Attorney | 219 South Dearborn Street, Fifth Floor | Fax: (312) 353-4322 |
| | Chicago, IL 60604 | E-mail: Paul.Mower@usdoj.gov |

August 18, 2020

Re:  Officer Interview Disclosure Letter – Officer Brandon McDonald

On June 9, 2020, Assistant U.S. Attorney Paul Mower interviewed Chicago Police Department Officer Brandon McDonald at the U.S. Attorney's Office. Federal Bureau of Investigation Special Agent Dustin Gourley was also present for substantive portions of the interview. Before the beginning of the interview, Officer McDonald was given the opportunity to review the CPD Arrest and Case Incident Report under CPD RD #JD24992. Officer McDonald provided information consistent with information found in the reports, and also provided the following additional information:

1.      Officer McDonald stated that he was hired by the Chicago Police Department in approximately February 2014. He previously worked in the 6th, 4th, and 3rd Districts, and started working as a patrol officer in the 22nd District in approximately 2016.

2.      Officer McDonald stated that on the night of WALTON's arrest, he was patrolling in a single squad car with Officers Kevin Paruszkiewicz, Monica Richardson, and Edwin Diaz. Officer McDonald was riding in the front passenger seat. The officers were patrolling westbound on 115th Street and entered Marshfield Plaza from the north, near L.A. Fitness. The officers were not responding to a particular dispatch, they were simply patrolling through the plaza because it had previously been hit by looters earlier in the day.

3.      Officer McDonald stated that there had been heavy looting of multiple stores throughout the day on May 31, and several businesses had broken windows and merchandise strewn throughout the parking lot. As the officers proceeded southbound through the plaza with their emergency lights activated, he observed multiple looters carrying merchandise run to vehicles scattered throughout the parking lot and flee the scene.

4.      Officer McDonald stated that when the officers reached an Old Navy, he saw more people, including WALTON and a female later identified as WALTON's girlfriend, exit the store. WALTON was carrying merchandise and ran towards a

black Honda CR-V that was parked facing west in front of the Old Navy. WALTON attempted to open the driver's side door of the CR-V, but was unsuccessful. He then dropped the items he was carrying and ran southbound through the plaza parking lot. Meanwhile, WALTON's girlfriend, who did not exit the store with WALTON, entered a different vehicle occupied by other individuals, and drove away.

5.      Officer McDonald stated that he and the other officers remained in front of the Old Navy near the Honda CR-V. WALTON eventually returned to the CR-V from the same direction he had fled. Officer Richardson asked WALTON why he ran, and WALTON responded that he did not want to go to jail, that he did not care about the merchandise, and that he just wanted to get his car and leave. At one point, WALTON's girlfriend also returned to the scene on foot from the same direction as WALTON, but remained approximately 10-15 feet back from the officers. Officer McDonald did not know what happened to the vehicle that WALTON's girlfriend had previously entered.

6.      Officer McDonald stated that by this point, he and the other officers had begun looking through the windows of the CR-V with their flashlights. While they did so, WALTON started to approach Officer Richardson and said he wanted to talk to her. Officer Richardson told him to stand back. WALTON then approached Officer McDonald and repeated that he needed to tell the officers something. Officer McDonald initially echoed Officer Richardson's order to stand back, but WALTON continued to insist. He allowed WALTON to come closer to the vehicle, at which point WALTON stated, "I have a gun in the car." Officer McDonald asked WALTON where the gun was located. WALTON said it was on the floor on the driver's side.

7.      Officer McDonald stated that he directed WALTON to unlock the vehicle and proceeded to enter the driver's side door. Initially, he did not observe a firearm on the floor. When he told WALTON, WALTON maintained that the gun should be where he said. Officer McDonald then observed a large pile of stolen merchandise on the center console, between the driver and passenger seats. When he moved the merchandise out of the way, he saw the Walther P22 in a cup holder in the center console.

8.      Officer McDonald stated that he removed the firearm and returned to his police vehicle. WALTON told Officer McDonald that he previously had several gun cases and was on parole, and did not want to go back to jail. WALTON further said words to the effect of, "please tell me you're not going to arrest me. I was honest." At this point, WALTON was not in handcuffs, and had not been placed under arrest. Officer McDonald asked WALTON why he would be carrying a gun if he was on parole. WALTON did not respond.

2

9.     Officer McDonald stated that he returned to WALTON's vehicle and continued searching, and eventually discovered a case of .22 caliber long-rile ammunition in the glove compartment. The officers then arrested WALTON. WALTON started to cry, and his girlfriend began to console him. WALTON asked for a cigarette, but the officers said no. They gave WALTON's girlfriend the keys to the CR-V and allowed her to leave (without the stolen merchandise).

10.     Officer McDonald stated that the officers read WALTON his *Miranda* rights at the station and that he declined to answer questions. Officer McDonald further stated, however, that as he and Officer Paruszkiewicz were escorting WALTON to lock-up, WALTON gave spontaneous statements to the effect of, "I can't believe I did this again," "My family said if I get arrested again, they're going to abandon me," and, "If I had the gun in my hand when you guys arrested me, I would have killed myself." WALTON was also banging against the wall with his hands.

11.     Officer McDonald stated that he started working sometime in the morning on May 31, 2020, and that by the time of WALTON's arrest just after midnight on June 1, the battery on his BWC unit had died. With permission from his sergeant, he left it at the station earlier in the day to recharge and then went back on patrol.

Special Agent Gourley and Officer McDonald have reviewed this report and agree to its contents.

Very truly yours,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/ Paul Mower*
Paul Mower
Assistant United States Attorney

3

# EXHIBIT C



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| Paul Mower | Dirksen Federal Courthouse | Direct Line: (312) 353-5349 |
| Assistant United States Attorney | 219 South Dearborn Street, Fifth Floor | Fax: (312) 353-4322 |
| | Chicago, IL 60604 | E-mail: Paul.Mower@usdoj.gov |

August 18, 2020

Re:     Officer Interview Disclosure Letter – Officer Monica Richardson

On June 17, 2020, Assistant U.S. Attorney Paul Mower interviewed Chicago Police Department Officer Monica Richardson at the U.S. Attorney's Office. Federal Bureau of Investigation Special Agent Dustin Gourley was also present for substantive portions of the interview. Before the beginning of the interview, Officer Richardson was given the opportunity to review the CPD Arrest and Case Incident Report under CPD RD #JD24992. Officer Richardson provided information consistent with information found in the reports, and also provided the following additional information:

1.      Officer Richardson stated that she started working for the Chicago Police Department in approximately April 2008. She has worked in the 4th and 22nd Districts.

2.      Officer Richardson stated that on the night of WALTON's arrest, she was patrolling in a single squad car with Officers Brandon McDonald, Kevin Paruszkiewicz, and Edwin Diaz. Officer Richardson was riding in the backseat on the driver's side. The officers had been to Marshfield Plaza multiple times that day.

3.      Officer Richardson stated that when the officers entered Marshfield Plaza off of 115th Street and proceeded south through the parking lot, she observed "havoc." Multiple people were running out of stores with merchandise, including City Sports and Dollar Tree. She observed multiple cars parked in front of Old Navy, including the vehicle that was later identified as belonging to WALTON. She saw WALTON exit the Old Navy carrying merchandise and run towards the vehicle. She further saw WALTON unsuccessfully attempt to open the driver's door before dropping the stolen merchandise and running away on foot, going southeast through the parking lot. She also observed the female later identified as WALTON's girlfriend separately exit the store, enter another car filled with other occupants that was parked next to WALTON's vehicle, and drive away. She identified a known photograph of Danielle Davenport as WALTON's girlfriend.

1

4.     Officer Richardson stated that she and the other officers observed large amounts of suspected stolen merchandise "piled up" inside WALTON's vehicle, and that it appeared that WALTON had been on an "all-night looting binge." Eventually WALTON returned to his car on foot from the same general direction he had fled. WALTON's girlfriend returned to the scene on foot shortly after WALTON, and from the same direction. WALTON's girlfriend just stood there during WALTON's interactions with the officers, and attempted to get WALTON to calm down.

5.     Officer Richardson stated that WALTON initially kept a distance between himself and the officers. The officers instructed WALTON to remove the stolen merchandise from his car. In response, WALTON told the officers, "you all can have everything," or words to that effect. The officers began to take everything out of the car. Officer McDonald was near the front driver's side, Officer Paruszkiewicz was near the front passenger side, and Officers Richardson and Diaz were near the back. WALTON tried to approach and speak with her, but she told him "there was nothing to talk about." WALTON then asked Officer McDonald if he could speak with him. WALTON told Officer McDonald words to the effect of, "I have something in there I'm not supposed to have," and then he and Officer McDonald continued to talk off to the side of the vehicle. She did not hear the part of the conversation where WALTON reportedly told Officer McDonald, "I have a gun in the car."

6.     Officer Richardson stated that after Officer McDonald spoke with WALTON, Officer McDonald reentered the front driver's side of the vehicle and came out with a gun. The officers did not immediately place WALTON under arrest. They asked WALTON whether he had a FOID card, and WALTON said no. WALTON was panicky and sweating, and started to back away when the officers started to approach him. She did not hear WALTON tell Officer McDonald, "I know I shouldn't have a gun" or "I'm on parole for a gun." She also never heard WALTON or WALTON's girlfriend claim that the firearm in the vehicle belonged to her, or that WALTON was unaware of its presence. The officers eventually placed WALTON into custody. WALTON asked if he could have cigarette and kiss his girlfriend. The officers allowed the kiss, but not the cigarette.  Officer Richardson stated that the officers turned over custody of WALTON's vehicle to his girlfriend.

8.     Officer Richardson stated that on May 30, 2020, she and Officer Diaz had been assigned to work the protests taking place in downtown Chicago. During that shift, her BWC and protective vest had been hit and covered by various items thrown by protestors, and some protestors stole or attempted to steal items hanging from other officers' vests, including BWC units and cell phones. As a result, she wore a different protective vest the following day when she and Officer Diaz started working with Officers McDonald and Paruszkiewicz, and was wearing it "clean" (i.e.,

2

free from additional gear, including her BWC), in case she and Officer Diaz were reassigned downtown.

Special Agent Gourley and Officer Richardson have reviewed this report and agree to its contents.

Very truly yours,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/ Paul Mower* _____
Paul Mower
Assistant United States Attorney

3

EXHIBIT D

STATE OF

ILLINOIS

)

)           SS:

COUNTY OF COOK    )

## AFFIDAVIT

Now comes PEDRO ALFARO testifying as if under oath states the following:

1.

I have knowledge of the facts in this Affidavit and if called upon to testify I could do so competently.

2.     I am employed as an investigator for the Federal Defender Program for the Northern District of Illinois.

3.     I participated in a phone interview of Ms. Danielle Davenport on February 10, 2021.

4.

1

Ms. Davenport stated that she was present in the parking lot of Marshfield Plaza in the evening of May 31, 2020 and the early morning hours of June 1, 2020.

5.

Ms. Davenport stated that she was present for the conversation between Mr. Walton and the Chicago Police Officers, and that at no point did she hear Mr. Walton make any admission that there was a gun in the car.

6.

Ms. Davenport affirmed that she did not see any stolen merchandise in the car prior to parking at Marshfield Plaza. She further affirmed that she did not see any stolen merchandise in the vehicle while she observed the encounter between Mr. Walton and the officers. Finally, Ms. Davenport stated that the officers did not remove any stolen merchandise from the car prior to giving her the keys and allowing her to drive the vehicle out of Marshfield Plaza.

9.

I have not included every fact I know about this investigation in this

affidavit.

*Pedro Alfaro*

PEDRO ALFARO

Sworn and subscribed remotely before me
on this 22 day of March, 2021

Notary Public
55 E. Monroe, #2800
Chicago, IL 60603

OFFICIAL SEAL
ISABEL ANTUNEZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:04/02/23

3